# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Andre Brown,                          :
              Petitioner         :
                                 :
          v.                 :  No. 547 C.D. 2018
                                 :  SUBMITTED:  August 3, 2018
Workers' Compensation Appeal          :
Board (Atlantic Roofing               :
Corporation),                         :
              Respondent         :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE RENÉE COHN JUBELIRER, Judge
              HONORABLE ELLEN CEISLER, Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE CEISLER                    FILED:  December 21, 2018

Andre Brown (Claimant) petitions for review of the March 27, 2018 Order of the Workers' Compensation Appeal Board (Board), which affirmed the March 23, 2017 Decision and Order of the Workers' Compensation Judge (WCJ).  The WCJ denied Claimant's Claim Petition for alleged work-related injuries sustained on December 3, 2015.  The WCJ also denied Claimant's Penalty Petition, concluding that Atlantic Roofing Corporation's (Employer) failure to take action with the Bureau of Workers' Compensation (Bureau) within 21 days after receiving notice of Claimant's injury did not violate Section 406.1(a) of the Workers' Compensation Act (Act).[1]  The Board found that "[Employer's] failure to issue a Bureau document

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 717.1(a).  Section 406.1(a) of the Act was added by the Act of February 8, 1972, P.L. 25, and provides:

> The employer and insurer shall promptly investigate each injury reported or known to the employer and shall proceed promptly to commence the payment of

is a violation [of the Act] … [but] because there was no award of compensation … [there was] no error requiring appellate correction."[2]  The Board affirmed the WCJ.

The issues before this Court are whether the WCJ's finding that Claimant did not sustain a compensable work-related injury is supported by substantial evidence and whether the WCJ erred in denying Claimant's Penalty Petition.  After careful review, we affirm in part, reverse in part, and remand for further action.

## I. Background

On March 25, 2016, Claimant filed a Claim Petition alleging that on December 3, 2015, while working for Employer as a roof mechanic, he suffered "electrocution with lumbar strain/sprain, lumbar disc herniation and radiculopathy"[3] and became disabled as of January 15, 2016.  On April 5, 2016, Claimant filed a Penalty Petition alleging that Employer violated Section 406.1(a) of the Act by failing to timely file a response to Claimant's Claim Petition with the Bureau within 21 days of receiving notice of Claimant's injury.

---

compensation due either pursuant to an agreement upon the compensation payable or a notice of compensation payable as provided in [S]ection 407 [of the Act] or pursuant to a notice of temporary compensation payable as set forth in [Section 406.1(d) of the Act], on forms prescribed by the department and furnished by the insurer.  The first installment of compensation shall be paid not later than the twenty-first day after the employer has notice or knowledge of the employe's disability.  Interest shall accrue on all due and unpaid compensation at the rate of ten per centum per annum.  Any payment of compensation prior or subsequent to an agreement or notice of compensation payable or a notice of temporary compensation payable or greater in amount than provided therein shall, to the extent of the amount of such payment or payments, discharge the liability of the employer with respect to such case.

77 P.S. § 717.1(a).

[2] Board Op., 3/27/18, at 7; Reproduced Record (R.R.) at 195a.

[3] Certified Record (C.R.), Item No. 2, at 2.

2

The WCJ held an evidentiary hearing on both Petitions on October 4, 2016.

## A. Claimant's Evidence at the Hearing

Claimant testified that on December 3, 2015, while working for Employer on a roof, a knife that Claimant was holding in his left hand came in contact with a metal pipe, sending an electrical shock into Claimant's arm. WCJ's Op., 3/23/17, Finding of Fact (F.F.) No. 5a-b; Reproduced Record (R.R.) at 180a. Claimant jerked his left arm to free himself from the electrical current. WCJ's Op., 3/23/17, F.F. No. 8b; R.R. at 182a. As a result of this incident, Claimant claims to have suffered numbness in his left arm and pain on the right side of his low back. WCJ's Op., 3/23/17, F.F. No. 5b; R.R. at 180a.

Claimant promptly reported the incident to his supervisor Jim Souders who sent Claimant to the emergency room (ER). Claimant underwent an examination, including a neurological examination, with normal findings. Claimant did not have any physical manifestation of an electrical shock such as burns or exit wounds. As a precaution, the ER staff monitored his heart and gave him an intravenous for the protein in his muscle in case the muscles broke down due to the electric current. WCJ's Op., 3/23/17, F.F. No. 5c; WCJ's Hr'g, Notes of Testimony (N.T.), 4/26/16, at 11-12; R.R. at 11a-12a, 180a. Claimant was released from the ER that same day; however, the treating physician told Claimant to not work for two days. Claimant notified Employer of the doctor's order. WCJ's Op., 3/23/17, F.F. No. 5c; WCJ's Hr'g, N.T., 4/26/16, at 11-12; R.R. at 11a-12a, 180a. On December 8, 2015, Claimant returned to work full-time with no restrictions.[4] At some point during that week, he complained to his supervisor, Mr. Souders, of right low-back pain and

---

[4] According to Claimant, Monday, December 7, 2015 was a "bad weather" day, so he did not work that day. WCJ's Hr'g, N.T., 4/26/16, at 12-13; R.R. at 12a-13a.

3

numbness from his hand[5] down to his right hip and right leg. WCJ's Op., 3/23/17, F.F. No. 5d; WCJ's Hr'g, N.T., 4/26/16, at 11, 14; R.R. at 11a, 14a, 180a.

Claimant further testified that on December 9, 2015, he treated with his family physician, Dr. Joseph Cipriano. Dr. Cipriano did not take Claimant out of work. Over the next several weeks, as Claimant continued to work, his right leg pain worsened and he began to experience a pins and needles sensation. WCJ's Op., 3/23/17, F.F. No. 5e; WCJ's Hr'g, N.T., 4/26/16, at 14-15; R.R. at 14a-15a, 180a.

Claimant last worked on January 15, 2016 since he was laid off due to lack of work on January 16, 2016.[6] On January 19, 2016, Claimant went to Mercy Suburban Hospital by ambulance because he could not walk or get out of bed for two days due to pain. WCJ's Op., 3/23/17, F.F. No. 5f; WCJ's Hr'g, N.T., 4/26/16, at 20; R.R. at 20a, 180a-81a. Claimant explained to the hospital staff that his right hip pain had gradually increased over the previous three days. WCJ's Op., 3/23/17, F.F. No. 5f; WCJ's Hr'g, N.T., 4/26/16, at 34-35; R.R. at 34a-35a, 180a-81a. Claimant's treating physician at the hospital gave Claimant a note indicating that Claimant could not return to work. WCJ's Op., 3/23/17, F.F. No. 5i; WCJ's Hr'g, N.T., 4/26/16, at 36; R.R. at 180a-81a. That same day, Claimant notified Employer that he went to the hospital for right hip pain and he was ordered by the hospital physician to not resume work. WCJ's Op., 3/23/17, F.F. No. 5i; WCJ's Hr'g, N.T., 4/26/16, at 16-17; R.R. at 16a-17a, 180a-181a.

In late January 2016, Claimant treated with James Nicholson, D.O., who imposed work restrictions on Claimant. WCJ's Op., 3/23/17, F.F. No. 5g; WCJ's

---

[5] The record does not indicate which hand.

[6] Since Claimant was laid off, Claimant received unemployment compensation benefits in the amount of $395/weekly. WCJ's Hr'g, N.T., 4/26/16, at 22, 32; WCJ's Op., 3/23/17, F.F. No. 5k-19; R.R. at 22a, 32a, 181a.

4

Hr'g, N.T., 4/26/16, at 17; R.R. at 17a, 181a. After Employer received notice of the work restrictions, Mr. Souders called Claimant and asked him to return to work. Claimant stated he could not work. WCJ's Op., 3/23/17, F.F. No. 5g; WCJ's Hr'g, N.T., 4/26/16, at 18-19; R.R. at 18a-19a, 181a. Approximately one week later, Mr. Souders called Claimant again and asked him to come into the office for an exit interview. WCJ's Op., 3/23/17, F.F. No. 5g; WCJ's Hr'g, N.T., 4/26/16, at 17; R.R. at 17a, 181a.

On February 17, 2016, Claimant underwent an electromyogram (EMG),[7] which indicated pain in his lower back. WCJ's Op., 3/23/17, F.F. No. 8d; Dep. of Philip Pearlstein, D.O. (Dr. Pearlstein), 7/7/16 at 13; R.R. at 75a, 122a, 138a 172a, 182a. On March 9, 2016, Claimant underwent a magnetic resonance imaging (MRI) of his back, which indicated a right-side mild disc bulge with herniation at L1-L2, L3-L4, and L5-S1 and a moderate right-side bulge with herniation at L2-L3. WCJ's Op., 3/23/17, F.F. No. 3d; Dep. of Dr. Pearlstein, 7/7/16 at 11, 13-15, 18, 26-27, R.R. at 75a-77a, 88a-89a.

Claimant also offered into evidence the deposition testimony of Philip Pearlstein, D.O., a board-certified general practitioner. WCJ's Op., 3/23/17, F.F. No. 8; WCJ's Hr'g, N.T., 10/4/16, at 13; R.R. at 55a, 182a. On April 27, 2016, Dr. Pearlstein examined Claimant and reviewed the EMG and MRI reports. WCJ's Op., 3/23/17, F.F. No. 8b, 8d; Dep. of Dr. Pearlstein, 7/7/16 at 15-18; R.R. at 77a-79a, 182a. Dr. Pearlstein opined that the MRI findings correlated with the EMG and that

---

[7] An EMG is a test that is used to record the electrical activity of muscles and can be used to detect abnormal electrical activity of muscle that can occur in many diseases and conditions, including muscular dystrophy, inflammation of muscles, pinched nerves, damage to nerves in the arms and legs, and disc herniation. MedicineNet.com, available at https://www.medicinenet.com/electromyogram/article.htm#what_is_an_electromyogram (last visited December 11, 2018).

Claimant's pain radiated down different parts of his right leg. Based on Dr. Pearlstein's physical examination, Claimant's history, and the diagnostic studies he reviewed, Dr. Pearlstein diagnosed Claimant with a herniated disc from L3 to L5 with low-back pain, which he attributed to Claimant's electric shock on December 3, 2015. Dr. Pearlstein stated the electric shock caused Claimant to move "into a funny position and he jerked." Dep. of Dr. Pearlstein, 7/7/16 at 30; R.R. at 92a. According to Dr. Pearlstein, Claimant then went into a ditch in the roof and "twisted in there." WCJ's Op., 3/23/17, F.F. No. 8f, 8d; Dep. of Dr. Pearlstein, 7/7/16 at 30; R.R. at 92a, 182a. Dr. Pearlstein treated Claimant with anti-inflammatory medication, a Transcutaneous electrical nerve stimulation (TENS) unit, and physical therapy. According to Dr. Pearlstein, Claimant was showing signs of improvement and was a good candidate for corticosteroid injections. Dep. of Dr. Pearlstein, 7/7/16 at 17; R.R. at 79a. Dr. Pearlstein acknowledged during each of the eight to ten times that he examined Claimant, Claimant had normal motor function, normal sensory function, and normal deep tendon reflexes. WCJ's Op., 3/23/17, F.F. No. 8k; Dep. of Dr. Pearlstein, 7/7/16 at 21-22; R.R. at 83a-84a, 183a. Dr. Pearlstein concluded that Claimant could no longer work as a roof mechanic. WCJ's Op., 3/23/17, F.F. No. 8i; Dep. of Dr. Pearlstein, 7/7/16 at 18; R.R. at 80a, 183a.

During cross-examination, Employer's counsel advised Dr. Pearlstein that Claimant worked full duty as a roof mechanic for well over a month after the incident. Dr. Pearlstein had not been aware of this. Dr. Pearlstein testified that: "[Claimant] told me he went back and he worked [only] one or two days here and one or two days there. [Not] full time." Dep. of Dr. Pearlstein, 7/7/16 at 25-26; R.R. at 87a-88a. After hearing this information, Dr. Pearlstein changed his opinion to reflect that Claimant was unable to work approximately one month after the incident

6

because Claimant's pain progressively worsened. WCJ's Op., 3/23/17, F.F. No. 8j; Dep. of Dr. Pearlstein, 7/7/16 at 26; R.R. at 88a, 183a.

On the date of the Claim Petition hearing, Claimant testified that he was still treating with Dr. Cipriano, and that Dr. Cipriano gave Claimant a note stating that he could not return to work. WCJ's Op., 3/23/17, F.F. No. 5i; WCJ's Hr'g, N.T., 4/26/16, at 20; R.R. at 20a, 181a.

### B. Employer's Evidence at the Hearing

Employer presented the testimony of John Yanan, Employer's President. WCJ's Hr'g, N.T., 10/4/16, at 6; R.R. at 48a. Mr. Yanan testified that Mr. Souders immediately called to notify him of the incident involving Claimant. Mr. Yanan immediately telephoned a trauma nurse, which is a service provided by Employer's insurance company, and told Claimant to tell the nurse what happened. The nurse asked Claimant a series of questions and then twice recommended that Claimant take an ambulance to the hospital. Claimant twice declined, saying it was not necessary. WCJ's Op., 3/23/17, F.F. No. 7a; WCJ's Hr'g, N.T., 10/4/16, at 8-9; R.R. at 50a-51a, 181a. Mr. Yanan had a company manager drive Claimant to the hospital in Camden, NJ, where they were working that day. WCJ's Hr'g, N.T., 10/4/16, at 9; R.R. at 51a.

Mr. Yanan testified that Employer laid off Claimant on January 16, 2016 for lack of work. Mr. Yanan testified that Employer occasionally laid off employees during the winter. WCJ's Op., 3/23/17, F.F. No. 7d; WCJ's Hr'g, N.T., 10/4/16, at 10-11; R.R. at 52a-53a, 182a.

Finally, Employer presented the deposition testimony of Dr. Ira Sachs, a board-certified orthopedic surgeon. Dr. Sachs performed an Independent Medical Examination (IME) of Claimant on June 29, 2016. WCJ's Op., 3/23/17, F.F. No. 9;

Dep. of Dr. Sachs, 9/15/16 at 7-8; R.R. at 114a-15a, 183a. As part of the IME, Dr. Sachs physically examined Claimant, reviewed Claimant's prior medical history, the ER records, and the EMG and MRI records. WCJ's Op., 3/23/17, F.F. No. 9b, 9c; R.R. at 115a, 183a-84a. During the examination, Claimant indicated that his right anterior thigh was completely numb. Dr. Sachs found this symptom to be "consistent with [meralgia] paresthetica"[8] and also noted that Claimant's medical records indicated that Claimant had this condition prior to December 3, 2015. WCJ's Op., 3/23/17, F.F. No. 9m; R.R. at 184a. Dr. Sachs agreed that the EMG report indicated lower back pain involving the right lower extremity. He determined that the MRI, performed four months after the injury, indicated multi-level *degenerative* changes and rear muscle strain and swelling at the L3, L5. Unlike Dr. Cipriano, Dr. Sachs found no indication of an L5-S1 abnormality on the MRI. Dr. Sachs opined that if in fact Claimant did injure his paraspinal muscles, the fluid and swelling should have resolved by four months after the injury, but he also noted that fluid and swelling can be the result of a degenerative process. WCJ's Op., 3/23/17, F.F. No. 9f-9k; Dep. of Dr. Sachs, 9/15/16 at 30; R.R. at 136a-37a, 184a.

Dr. Sachs testified that the ER records indicated a diagnosis of electric shock, but that those records did not reveal "overt evidence of electric shock . . . [such as] . . . burns or entry or exit wounds or that sort of thing." Dep. of Dr. Sachs, 9/15/16 at 12; R.R. at 119a; *see also* WCJ's Op., 3/23/17, F.F. No. 9n; R.R. at 183a. Dr. Sachs noted that the ER records indicated that Claimant's head, neck, upper and lower extremities, and neurologic examinations were all normal. WCJ's Op., 3/23/17,

---

[8] Meralgia paresthetica occurs when one of the sensory nerves of the legs becomes compressed,resulting in a burning sensation felt in the outer thigh.Hopkinsmedicine.org, available at https://www.hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/peripheral_nerve_surgery/conditions/cwt-meralgia-paresthetica.html (last visited December 11, 2018).

F.F. No. 9c; Dep. of Dr. Sachs, 9/15/16 at 12; R.R. at 121a, 183a. Dr. Sachs testified that Claimant's medical records also documented that in 1997, Claimant **fell three stories and fractured his low back at L1, L2, and L3**. WCJ's Op., 3/23/17, F.F. No. 9e; R.R. at 183a.

Dr. Sachs reviewed Dr. Cipriano's handwritten notes from one month after the incident. According to Dr. Sachs, Dr. Cipriano's notes appeared to indicate that Claimant had right thigh pain, weak right hip muscles, lower right extremity weakness, and negative straight leg raising. Dr. Sachs did not see anything in Dr. Cipriano's notes to indicate a specific **back** complaint. WCJ's Op., 3/23/17, F.F. No. 9g; R.R. at 184a.

Dr. Sachs opined that Claimant has multi-level degenerative changes in his back which were consistent with Claimant's age and his prior major back injury. WCJ's Op., 3/23/17, F.F. No. 9k; Dep. of Dr. Sachs, 9/15/16 at 20-21; R.R. at 127a-28a, 184a. He stated that Claimant's lack of complaints of pain until nearly one month after the incident was inconsistent with a trauma-induced herniated disc. WCJ's Op., 3/23/17, F.F. No. 9l; Dep. of Dr. Sachs, 9/15/16 at 34-35; R.R. at 141a-42a, 184a. Based upon his review of the medical records and his examination of Claimant, Dr. Sachs concluded that Claimant had non-work-related, multi-level, preexisting degenerative disease of the back. Dr. Sachs concluded that even *assuming* Claimant sustained soft tissue injuries to his back as a result of the electric shock, Claimant was fully recovered. Further, Dr. Sachs concluded, "to be clear, there's no evidence in the medical records at all to suggest . . . a significant electrocution type of episode in that there was no evidence of any kind of burns from that, no evidence of exit wounds, no evidence of neurologic abnormality secondary

9

to this type of electrical injury." Dep. of Dr. Sachs, 9/15/16 at 24-25; R.R. at 131a-32a.

## C. The WCJ's Decision

On March 23, 2017, the WCJ denied Claimant's Claim and Penalty Petitions. The WCJ concluded that while Claimant suffered an electric shock on December 3, 2015, Claimant did not meet his burden of proving that he sustained a compensable work-related "injury." WCJ's Op., 3/23/17, F.F. No. 11. In support of this determination, the WCJ made the following (paraphrased) findings of fact:

1. On December 3, 2015, while kneeling down, the knife Claimant was holding in his left hand came in contact with a pipe and he was electrocuted. WCJ's Op., 3/23/17, F.F. No. 4b; R.R. at 180a.

2. The ER records from the date of the injury did not document complaints of back or hip injury and did not reflect evidence of electric shock, such as burns or entry or exit wounds. WCJ's Op., 3/23/17, F.F. No. 11; R.R. at 185a.

3. Claimant's neurological examination from the ER on the date of the injury was normal. WCJ's Op., 3/23/17, F.F. No. 12h; R.R. at 186a.[9]

4. Claimant returned to his full-duty position as a roof mechanic within a few days of the incident and continued working for six more weeks, until he was laid off for lack of work on January 16, 2016. WCJ's Op., 3/23/17, F.F. No. 12a; R.R. at 185a.

5. Mr. Yanan's testimony was wholly credible and persuasive. The WCJ based this credibility finding on her personal observation of Mr. Yanan's demeanor while testifying. WCJ's Op., 3/23/17, F.F. No. 10; R.R. at 185a. In particular, the WCJ credited Mr. Yanan's testimony that on the day of the incident, the trauma nurse twice recommended that Claimant take an ambulance to the hospital, but Claimant twice declined. The WCJ also credited Mr. Yanan's testimony that when Claimant returned to work for

---

[9] The WCJ's Decision reflects an ER date of "2/3/15." Claimant's ER visit was actually on December 3, 2015. WCJ's Op., 3/23/17, F.F. Nos. 5c, 12h; Independent Medical Examination (IME), 6/29/18 at 5; R.R. at 173a, 180a, 186a.

six weeks after the incident, Mr. Yanan did not hear of any complaints of pain by Claimant. WCJ's Op., 3/23/17, F.F. No. 7b; R.R. at 181a. According to the WCJ, "[Mr. Yanan's] testimony is uncontradicted." WCJ's Op., 3/23/17, F.F. No. 10; R.R. at 185a.

6. Dr. Pearlstein's records show that Claimant had normal motor function, normal sensory function and normal deep tendon reflexes on all examinations. The WCJ found that Dr. Cipriano's note of January 19, 2016, reflects a negative straight leg raising.[10] WCJ's Op., 3/23/17, F.F. No. 9g; R.R. at 184a.

7. Dr. Pearlstein's testimony was not credible to the extent that it conflicted with Dr. Sachs' testimony because: (1) Dr. Pearlstein's opinion on causation was based on a history inconsistent with Claimant's testimony; (2) Dr. Pearlstein erroneously believed that Claimant did not work full time or full duty after the injury; (3) Claimant did not begin treating with Dr. Pearlstein until after he filed the Claim Petition; and (4) Dr. Pearlstein is a general practitioner, whereas Dr. Sachs is a board-certified orthopedic surgeon. WCJ's Op., 3/23/17, F.F. No. 12; R.R. at 185a.

8. Dr. Sachs' opinions were "based on and supported by the examination performed and the records and studies reviewed." WCJ's Op., 3/23/17, F.F. No. 12d; R.R. at 185a. The WCJ accepted the testimony of Dr. Sachs as credible, clear, logical, and well-supported. WCJ's Op., 3/23/17, F.F. No. 12e; R.R. at 186a.

9. Claimant had multi-level preexisting degenerative changes in his lower back. The "numbness in Claimant's thigh is consistent with [meralgia] paresthetica which is not a post traumatic finding." WCJ's Op., 3/23/17, F.F. No. 12f-g; R.R. at 186a.

---

[10] The straight leg raise test is conducted to determine if someone with low back pain has an underlying herniated disc (generally at L5). A negative straight leg test result suggests a cause other than a herniated disc for the back pain. Spineuniverse.com available at https://www.spineuniverse.com/blogs/hawkinson/testing-herniated-discs-straight-leg-raise (last visited October 23, 2018); epainassist.com available at https://www.epainassist.com/back-pain/lower-back-pain/how-and-why-is-straight-leg-raise-test-done-know-its-interpreration (last visited December 11, 2018).

Claimant timely appealed to the Board, which took no additional evidence and affirmed the WCJ's Order. This appeal followed.[11]

## II. Issues

On appeal, Claimant argues that the WCJ's finding that Claimant did not sustain a work-related injury on December 3, 2015 was not supported by substantial evidence. Claimant also argues that the WCJ erred in denying Claimant's Penalty Petition because Employer failed to timely file a response to Claimant's Petition with the Bureau in violation of Section 406.1(a) of the Act.

## III. Discussion

### A. Claim Petition

Claimant first challenges the WCJ's finding that Claimant did not suffer a work-related injury on December 3, 2015. Claimant disputes the WCJ's credibility determinations and argues that the WCJ improperly rendered a medical finding of her own when she concluded that an electric shock was not an "injury." Claimant asserts that "by concluding that the electric shock itself was not significant enough to qualify as an injury, the [WCJ] engaged in an arbitrary assessment as to how significant an electric shock must be to be considered an injury." Claimant's Br. at 10.

Employer argues that the evidence shows that Claimant's electrical shock did not rise to the level of a compensable work-related "injury."

---

[11] Our review of the Board's order is limited to determining whether the necessary findings of fact are supported by substantial evidence, whether the Board's procedures were violated, whether constitutional rights were violated, or whether an error of law was committed. *Walter v. Workers' Comp. Appeal Bd. (Evangelical Cmty. Hosp.)*, 128 A.3d 367, 371 n.5 (Pa. Cmwlth. 2015).

12

In a claim petition, the claimant has the burden of proving all of the elements necessary to support the award, including the existence of an injury[12] and disability and the duration of disability. *Inglis House v. Workmen's Comp. Appeal Bd. (Reedy)*, 634 A.2d 592, 595 (Pa. 1993).

However, not only must the claimant in a claim petition establish that the claimant sustained a work-related injury but also that such injury **resulted in a disability**, *i.e.*, a loss of earnings or a loss of earning power. *Eljer Indus. v. Workers' Comp. Appeal Bd. (Evans),* 707 A.2d 564, 566 (Pa. Cmwlth. 1998) (disability is to be regarded as synonymous with loss of earning power); *see Odd Fellow's Home of Pa. v. Workmen's Comp. Appeal Bd. (Cook),* 601 A.2d 465 (Pa. Cmwlth. 1991) (claimant must prove **both** injury and that the injury resulted in disability). **Much confusion has been triggered by courts not observing the distinction between "injury" and "disability" for purposes of workers' compensation.** *Volk v. Workmen's Comp. Appeal Bd. (Consolidation Coal Co.),* 647 A.2d 624, 628 n.6 (Pa. Cmwlth. 1994), *abrogated on unrelated grounds by Stanek v. Workers' Comp. Appeal Bd. (Greenwich Collieries)*, 756 A.2d 661, 665 (Pa. 2000) ("Too often the terms 'disability' and 'injury' are used interchangeably which results in confusion.").

In assessing the evidence, a WCJ has complete authority over questions of credibility, conflicting medical evidence, and evidentiary weight, and can accept or reject the testimony of any witness, in whole or in part. *Lombardo v. Workers' Comp. Appeal Bd. (Topps Co., Inc.)*, 698 A.2d 1378, 1381 (Pa. Cmwlth. 1997). The Court will not disturb the WCJ's findings if they are supported by substantial evidence. *Greenwich Collieries v. Workmen's Comp. Appeal Bd. (Buck)*, 664 A.2d

---

[12] A "work injury" is any injury, medical condition or disease that is caused by a person's job, according to Section 301(c)(1) of the Act. 77 P.S. §411(1).

703, 706 (Pa. Cmwlth. 1995). Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Mrs. Smith's Frozen Foods Co. v. Workmen's Comp. Appeal Bd. (Clouser)*, 539 A.2d 11, 14 (Pa. Cmwlth. 1988).

Here, it is undisputed that Claimant suffered an electrical shock on December 3, 2015, while working for Employer. For this reason, the WCJ erred in concluding that Claimant was not "injured."

However, the WCJ did not err in finding that Claimant did not sustain a compensable work-related disability, resulting in lost earnings, as a result of the shock. There is substantial evidence on the record to support this finding.

As indicated earlier, after this incident, Employer's trauma nurse twice recommended that Claimant take an ambulance to the hospital. Claimant twice declined indicating that he was fine. Employer ultimately forced Claimant to go to the ER as a precaution. At the ER, Claimant's neurological exam was normal and Claimant did not manifest any physical signs of an electrocution. He was treated and released from the ER. Claimant returned to work, full duty and without restriction two days later. Claimant worked his regular full duty job for six weeks after the electric shock, prior to being laid off due to lack of work. Claimant received no further treatment until six days later, when he went to his family physician, who also did not take him out of work. The WCJ also found that based on a review of the medical records and examination performed, and the credited expert testimony of Dr. Sachs, Claimant had non-work-related, multi-level, preexisting, degenerative disease of the back, consistent with his age and prior major back injury. For these reasons, we affirm the Board on this issue.

14

## B. Penalty Petition

Claimant next argues that Employer violated Section 406.1 of the Act[13] by failing to file a Notice of Temporary Compensation Payable (NTCP) within 21 days of Employer receiving Claimant's Claim Petition. As such, Claimant argues that the WCJ erred in denying his Penalty Petition.

"An employer violates Section 406.1 of the Act if it fails to issue [a Notice of Compensation Payable], [a Notice of Compensation Denied], or a [Notice of Temporary Compensation Payable] within twenty-one days of receiving notice of a work-related injury." *Coyne v. Workers' Comp. Appeal Bd. (Villanova Univ.)*, 942 A.2d 939, 951 (Pa. Cmwlth. 2008) (footnote omitted). This duty to issue still applies even where there is no loss of wages. *Waldameer Park, Inc. v. Workers' Comp. Appeal Bd. (Morrison)*, 819 A.2d 164, 169-70 (Pa. Cmwlth. 2003) *see also Orenich v. Workers' Comp. Appeal Bd. (Geisinger Wyoming Valley Med. Ctr.)*, 863 A.2d 165, 170 (Pa. Cmwlth. 2004).

Here, the proper course of action was for Employer to issue a "medical only" notice of compensation payable pursuant to Section 406.1(d)(1). Employer could then challenge any future medical bills it thought were unreasonable or not causally related to the injury, as well as any wage loss benefits it thought were unwarranted. *Armstrong v. Workers' Comp. Appeal Bd. (Haines & Kibblehouse, Inc.),* 931 A.2d 827 (Pa. Cmwlth. 2007); *Waldameer Park, Inc.* Employer had a duty to investigate Claimant's claim that he suffered an injury and then issue a notice of compensation

---

[13] Section 406.1 states in relevant part: "a) The employer and insurer shall promptly investigate each injury reported or known to the employer *and* shall proceed promptly to commence the payment of compensation due … pursuant to a notice of temporary compensation payable." 77 P.S. § 717.1(a) (Emphasis added.)

payable or denial. Employer specifically acknowledged that no Bureau documents were issued (in this case, a NTCP).[14]

If the employer fails to comply with Section 406.1(a), it can be liable for penalties. *Id.* However, it is within the WCJ's discretion whether to impose penalties for violations of the Act. *Orenich*, 863 A.2d at 170; *see* Section 435(d) of the Act, 77 P.S. § 991(d).[15] Even if a violation of the Act is apparent on the record, the discretion as to whether to impose a penalty remains with the WCJ. *Schatzberg v. Workers' Comp. Appeal Bd. (Bemis Co., Inc.)*, 136 A.3d 1081, 1083-84 (Pa. Cmwlth. 2016). "[A]bsent an abuse of [that] discretion by the WCJ, we will not overturn the WCJ's decision [with regard to penalties] on appeal." *Orenich*, 863 A.2d at 170. Section 435 of the Act, 77 P.S. § 991.

Moreover, Section 435(d)(i) of the Act states: "Employers and insurers may be penalized the sum not exceeding 10 per centum *of the amount awarded* and interest accrued and payable ...." 77 P.S. § 991(d)(i) (emphasis added); *see also Jaskiewicz v. Workmen's Comp. Appeal Bd. (James D. Morrisey, Inc.)*, 651 A.2d 623 (Pa. Cmwlth. 1994).

In the matter before us, Employer failed to file a NTCP after it received Claimant's Claim Petition, a fact that Employer concedes. The Board concluded that the Employer did in fact violate Section 406.1 of the Act, and, as such, the Board

---

[14] "[Employer's Attorney]: There are no Bureau documents, Your Honor, so I'm not sure what happened with this claim as to what benefits he received or he didn't receive." WCJ's Hr'g, N.T., 4/26/16, at 6; R.R. at 6a.

[15] Section 435(d) of the Act states in relevant part: "The department, the [B]oard, or any court which may hear any proceedings brought under this [A]ct shall have the power to impose penalties as provided herein for violations of the provisions of this act or such rules and regulations or rules of procedure." Added by Section 3 of the Act of February 8, 1972, P.L. 25, *as amended*, 77 P.S. § 991(d).

found that the WCJ erred in not finding that Employer violated the Act for failure to file a NTCP.

Nevertheless, the Board still concluded that the WCJ did not err in denying Claimant's Penalty Petition. We agree.

In concluding that Claimant failed to sustain his burden of proving that he suffered a compensable work-related injury, the WCJ did not award workers' compensation benefits. Because the WCJ did not award benefits, a penalty against Employer would be based on an amount awarded of zero. 77 P.S. § 991(d)(i); *Jaskiewicz*. For these reasons, the WCJ did not abuse her discretion in declining to impose a penalty.

## IV. Conclusion

Accordingly, we reverse the Board insofar as it affirmed the conclusion of the WCJ that Claimant failed to sustain his burden of proving that he was injured in the course of employment. We affirm the Board in all other respects. We remand the matter to the Board for further remand to the WCJ to calculate an award of medical benefits, **if any**, associated with Claimant's work injury of December 3, 2015, specifically taking into consideration any medical payments made by Employer as a result of this incident.

_____
ELLEN CEISLER, Judge

17

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Andre Brown,            :
           Petitioner      :
                           :
      v.                 :    No. 547 C.D. 2018
                           :
Workers' Compensation Appeal    :
Board (Atlantic Roofing         :
Corporation),                  :
           Respondent    :

## O R D E R

AND NOW, this 21st day of December, 2018, the Workers' Compensation Appeal Board's Order, dated March 27, 2018, is hereby REVERSED insofar as it affirmed the finding of the Workers' Compensation Judge (WCJ) that Andre Brown (Petitioner) failed to sustain his burden of proving that he was injured in the course of his employment. We affirm in all other respects.

We REMAND the matter to the Workers' Compensation Appeal Board for further remand to the WCJ to calculate an award of medical benefits associated with Petitioner's work injury, specifically taking into consideration any medical payments made by Atlantic Roofing Corporation as a result of this incident.

Jurisdiction relinquished.

_____
ELLEN CEISLER, Judge